Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT MCDONNELL, TABIELLA HOLSINGER, AND JAMES TRONKA, individually and on behalf of all others similarly situated, | No. 3:18-cv-5811 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | JURY TRIAL DEMANDED |
| v. | |
| FACEBOOK, INC., a Delaware corporation, | |
| Defendant. | |

CLASS ACTION COMPLAINT
010746-11 1065765 V1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  JURISDICTION ................................................................................................2

III.  VENUE .............................................................................................................3

IV.  PARTIES ...........................................................................................................3

    A.  Plaintiffs .................................................................................................3

        1.  Connecticut Plaintiff ..................................................................3

        2.  Idaho Plaintiff ...........................................................................4

        3.  Pennsylvania Plaintiff ...............................................................5

    B.  Defendant ...............................................................................................6

V.  FACTUAL ALLEGATIONS ...........................................................................7

    A.  Facebook's collection of massive amounts of personal information from
        its users ....................................................................................................8

    B.  Facebook's monetization of the data it collects from users .....................8

        1.  The making of an advertising giant through greater leveraging of
            user data ....................................................................................8

        2.  The relentless push for greater profitability from user data ..........11

    C.  Facebook's agreements and policies applicable to user data ...................13

    D.  The Kogan/GSR-Cambridge Analytica breach ......................................15

    E.  Mission accomplished and aftermath ......................................................20

VI.  CLASS ALLEGATIONS .................................................................................21

VII.  APPLICATION OF CALIFORNIA LAW .......................................................24

VIII.  EQUITABLE TOLLING/CONTINUING VIOLATION ..................................25

IX.  CAUSES OF ACTION .....................................................................................26

COUNT I  BREACH OF CONTRACT ..........................................................................26

COUNT II  BREACH OF THE IMPLIED COVENENT OF  GOOD FAITH AND
        FAIR DEALING .................................................................................................27

COUNT III  VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
        (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) ...........................................28

A.   Unfair prong ............................................................................29

B.   Fraudulent prong ......................................................................30

C.   Unlawful prong .........................................................................31

D.   UCL summary ...........................................................................31

COUNT IV  QUANTUM MERUIT TO RECOVER SUMS  HAD BY UNJUST
ENRICHMENT .......................................................................................32

COUNT V  VIOLATION OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. §
2701, *ET SEQ.* ......................................................................................33

X.      REQUEST FOR RELIEF ...............................................................................36

XI.     DEMAND FOR JURY TRIAL .......................................................................36

Plaintiffs Scott McDonnell, Tabell Holsinger, and James Tronka, individually and on behalf of other Americans similarly situated, allege as follows:

## I.   INTRODUCTION

1.     Defendant Facebook, Inc. operates a hugely successful social network that is fueled by unfathomable amounts of its users' personal information, including information as to their likes and dislikes of various goods, events, and opinions; their religious persuasion; and their political leanings. Though Facebook touts its network as free to use, it is anything but.  Instead of money, its users exchange their information for access to and use of the network, which Facebook monetizes to the magnitude of billions of dollars in profit per year.  That's the consideration that users pay to use the Facebook network.

2.     But there are conditions, and these are spelled out in Facebook's user agreements and privacy policies—policies which have in the past, and have now again, caught the eye of the Federal Trade Commission.[1]

3.     Plaintiffs bring this suit because Facebook breached these agreements and policies by permitting third parties to exploit its lax to non-existent enforcement practices.  For a period in 2014, Facebook stood idly by while an app developer, Aleksandr Kogan, sucked down the data portfolios of 70 million of its American users.[2]  Because of this inaction, the developer, via his English company, Global Science Research Ltd. (GSR), was able to sell this treasure trove of data to yet another English

---

[1] *See, e.g.*, Louise Matsakis, *The FTC is Officially Investigating Facebook's Data Practices*, WIRED (Mar. 26, 2018), https://www.wired.com/story/ftc-facebook-data-privacy-investigation/.

[2] According to Dr. Kogan, Facebook's systems choked on the large volumes being transferred, and momentarily paused the process, but Facebook did nothing to stop it.  Paris Martineau, *Read the Full Kogan Email: Researcher Says Facebook Is Scapegoating Him*, THE OUTLINE (Mar. 22, 2018), https://theoutline.com/post/3838/read-the-full-kogan-email-researcher-says-facebook-is-scapegoating-him ("If my memory is right, we hit the API rate limit, and once we paused collection for a minute, were able to continue.").

Chris Wylie, a former Cambridge Analytical employee who broke this story widely, has testified to a U.K. parliamentary select committee that Dr. Kogan told him in about July 2014 that he talked to Facebook engineers about the pause in collection, which would have placed Facebook on clear notice of what was occurring.  *See* Natasha Lomas, *Facebook data misuse scandal affects "substantially" more than 50M, claims Wylie*, TECHCRUNCH (Mar. 27, 2018), https://techcrunch.com/2018/03/27/facebook-data-misuse-scandal-affects-substantially-more-than-50m-claims-wylie/ ("During the testimony Wylie also suggested Facebook might have found out about the GSL [sic] data harvesting project as early as July 2014 — because he says Kogan told him, around that time, that he had spoken to Facebook engineers after his app's data collection rate had been throttled by the platform.").

company, SCL Elections, that then transferred it to its affiliate, Cambridge Analytica.  The aim was to create so-called psychographs of the targeted Americans so that they could be used to influence voting in various U.S. elections.

4.      What's more, Facebook made only the weakest attempts to prevent further access to this data.  It merely asked these exploitative actors to certify that they'd destroyed the data.[3]  But this had the effect that could be expected: little to none.  Reports indicate that some or all of this data is still extant, such that bad actors and foreigners bent on influencing our elections can still do what they will with it.

5.      Plaintiffs bring this suit in order to find some measure of justice with respect to Facebook's behavior.  A good deal of Facebook's immense profits are due to its collection, storage, and use of data acquired from Plaintiffs and members of the proposed class.  Given its highly consequential breach of its promised privacy protections, which were essential to its ability to procure this data in the first place, Facebook should not be able to profit from: (a) sums it should have spent to give effect to these protections; and (b) sums attributable to its business uses of this data, including for advertising purposes.  These sums should be turned over to the putative class, along with the other damages requested in this complaint, and injunctive relief should issue to ensure that Facebook's users are not injured by similar shenanigans again.  Also, Facebook should face the consequences for its violation of the Stored Communications Act.

## II.      JURISDICTION

6.      Pursuant to 28 U.S.C. § 1331, this Court has original subject matter jurisdiction over the claims that arise under the Stored Communications Act, 18 U.S.C. §§ 2701, *et. seq*.  Also, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.      Additionally, or alternatively, this Court has subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed class

---

[3] On Friday, April 6, 2018, Facebook finally admitted that it should have conducted an audit when it claims, despite evidence to the contrary, *see supra* n.2, that it first learned the data had been accessed improperly.  *See, e.g.*, The Associated Press, *Facebook says it should have audited Cambridge Analytica*, ABC NEWS (Apr. 6, 2018), https://abcnews.go.com/Technology/wireStory/facebook-audited-cambridge-analytica-54283797.

consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and Plaintiffs are citizens of a state different from Defendant, which is a Delaware corporation with its principal place of business in California.

### III.    VENUE

8.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. Furthermore, Facebook's principal place of business is in this judicial district, and it is believed, and therefore alleged, that a substantial amount of the conduct of which Plaintiffs complain occurred in this judicial district.  Also, Facebook has marketed, advertised, and done much business within this judicial district.  And Facebook's venue provision in its Statement of Rights and Responsibilities also provides for venue in this Court.[4]

9.    Additionally, the San Francisco division of this Court is the proper division for filing, given Facebook's headquarters in Menlo Park, California.

### IV.    PARTIES

**A.    Plaintiffs**

**1.    Connecticut Plaintiff**

10.    Plaintiff Scott McDonnell is a citizen and a resident of the State of Connecticut. Plaintiff McDonnell created his Facebook account approximately ten years ago.  Plaintiff McDonnell maintains his Facebook account to the present day.  Plaintiff McDonnell has accessed his Facebook account from a mobile phone and a personal computer.  Plaintiff McDonnell has watched and "liked" videos on Facebook and has also "liked" pages on Facebook that contain videos.  Plaintiff McDonnell also uses Facebook messenger and/or instant messaging through Facebook.  Plaintiff McDonnell

---

[4] *Statement of Rights and Responsibilities*, ¶ 15.1 (Disputes), FACEBOOK (revised Jan. 30, 2015), https://www.facebook.com/terms.php ("Jan. 30, 2015 Statement of Rights and Responsibilities") ("You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims.").  The current Facebook terms also include such a provision. *Terms of Service*, ¶ 4.4 (Additional Provisions-Disputes), FACEBOOK (revised Apr. 19, 2018), https://www.facebook.com/legal/terms/plain_text_terms.

shared content and information with Facebook, which he expected Facebook to protect and secure against access by or disclosure to unauthorized parties.  In approximately April 2018, Plaintiff McDonnell received notice from Facebook that his Personal Information may have been "shared" with and "misused" by the "thisisyourdigitallife" app, because one of Plaintiff McDonnell's Facebook friends downloaded the "thisisyourdigitallife" app.  Plaintiff McDonnell was not aware of and did not consent to the sharing of his content and information with the "thisisyourdigitallife" app. Moreover, Plaintiff McDonnell did not consent to any third-parties accessing his content and information through his Facebook friends and had no knowledge that Facebook had authorized this disclosure of his content and information without his consent.

11.     During the 2016 U.S. Presidential election, Plaintiff McDonnell frequently received political advertisements while using Facebook. On information and belief, Plaintiff McDonnell was targeted by some or all of these advertisements as a result of the Cambridge Analytica Scandal. As a result of the release of his content and information, Plaintiff McDonnell has suffered emotional distress, including anxiety, concern, and unease about unauthorized parties viewing and using his content and information for improper purposes, such as identity theft and fraud as well as further intruding upon Plaintiff McDonnell's private affairs and concerns, as detailed herein. Plaintiff McDonnell fears that he is at risk of identity theft and fraud, and now spends approximately two hours each month monitoring his credit, bank, and other account statements for evidence of identity theft and fraud, and anticipates continuing to do so for the foreseeable future.  Because of his heightened risk of identity theft and fraud, Plaintiff McDonnell has purchased credit monitoring and identity theft protection services, for which he pays approximately $40 per month, and anticipates continuing to pay for such services for the foreseeable future

**2.    Idaho Plaintiff**

12.     Plaintiff Tabell Holsinger is a citizen and a resident of the State of Idaho. Plaintiff Holsinger created her Facebook account approximately nine years ago. Plaintiff Holsinger maintains her Facebook account to the present day.  Plaintiff Holsinger has accessed her Facebook account from a mobile phone. Plaintiff Holsinger has watched and "liked" videos on Facebook and has also "liked" pages on Facebook that contain videos.  Plaintiff Holsinger also uses Facebook messenger and/or

instant messaging through Facebook.  Plaintiff Holsinger shared content and information with Facebook, which she expected Facebook to protect and secure against access by or disclosure to unauthorized parties.  Plaintiff Holsinger confirmed on Facebook that her content and information "was likely shared with" and may have been "misused" by the "thisisyourdigitallife" app, because one of Plaintiff Holsinger's Facebook friends downloaded the "thisisyourdigitallife" app.  Plaintiff Holsinger was not aware of and did not consent to the sharing of her content and information with the "thisisyourdigitallife" app.  Moreover, Plaintiff Holsinger did not consent to any third-parties accessing her content and information through her Facebook friends and had no knowledge that Facebook had authorized this disclosure of her content and information without her consent.

13.     During the 2016 U.S. Presidential election, Plaintiff Holsinger frequently received political advertisements while using Facebook. On information and belief, Plaintiff Holsinger was targeted by some or all of these advertisements as a result of the Cambridge Analytica Scandal. As a result of the release of her content and information, Plaintiff Holsinger has suffered emotional distress, including anxiety, concern, and unease about unauthorized parties viewing and using her content and information for improper purposes, such as identity theft and fraud as well as further intruding upon Plaintiff Holsinger's private affairs and concerns, as detailed herein. Plaintiff Holsinger fears that she is at risk of identity theft and fraud, and now spends approximately four hours each month monitoring her credit, bank, and other account statements for evidence of identity theft and fraud, and anticipates continuing to do so for the foreseeable future.

### 3.     Pennsylvania Plaintiff

14.     Plaintiff James Tronka is a citizen and a resident of the State of Pennsylvania.  Plaintiff Tronka created his Facebook account approximately ten years ago.  Plaintiff Tronka maintains his Facebook account to the present day. Plaintiff Tronka has accessed his Facebook account from a mobile phone. Plaintiff Tronka has watched and "liked" videos on Facebook and has also "liked" pages on Facebook that contain videos. Plaintiff Tronka also uses Facebook messenger and/or instant messaging through Facebook.  Plaintiff Tronka shared content and information with Facebook, which he expected Facebook to protect and secure against access by or disclosure to unauthorized parties.  Plaintiff Tronka confirmed on Facebook that his content and information that his content and

information may have been "shared" with and misused by the "thisisyourdigitallife" app, because one of Plaintiff Tronka's Facebook friends downloaded the "thisisyourdigitallife" app. Plaintiff Tronka was not aware of and did not consent to the sharing of his content and information with the "thisisyourdigitallife" app. Moreover, Plaintiff Tronka did not consent to any third-parties accessing his content and information through his Facebook friends and had no knowledge that Facebook had authorized this disclosure of his content and information without his consent.

15.     During the 2016 U.S. Presidential election, Plaintiff Tronka frequently received political advertisements while using Facebook. On information and belief, Plaintiff Tronka was targeted by some or all of these advertisements as a result of the Cambridge Analytica Scandal. As a result of the release of his content and information, Plaintiff Tronka has suffered emotional distress, including anxiety, concern, and unease about unauthorized parties viewing and using his content and information for improper purposes, such as identity theft and fraud as well as further intruding upon Plaintiff Tronka's private affairs and concerns, as detailed herein. Plaintiff Tronka fears that he is at risk of identity theft and fraud, and now spends approximately two to three hours each month monitoring his credit, bank, and other account statements for evidence of identity theft and fraud, and anticipates continuing to do so for the foreseeable future.

**B.      Defendant**

16.     Facebook is a Delaware corporation, with its headquarters and principal place of business in Menlo Park, California.

17.     Facebook is the world's most successful social media network, with approximately 214 million registered users in the United States alone.[5]

18.     It's also a highly profitable enterprise, with a market cap of approximately $464 billion as of today.[6]  It's estimated that in 2017, Facebook's net income totaled some $15.934 billion.[7]

---

[5] *Number of Facebook users by age in the U.S. as of January 2018 (in millions)*, STATISTA, https://www.statista.com/statistics/398136/us-facebook-user-age-groups/ (last accessed Apr. 9, 2018).

[6] *Facebook, Inc. (FB)*, YAHOO! FINANCE, https://finance.yahoo.com/quote/FB/ (last accessed Apr. 9, 2018).

[7] *Facebook Reports Fourth Quarter and Full Year 2017 Results*, FACEBOOK (Jan. 31, 2018), https://investor.fb.com/investor-news/press-release-details/2018/Facebook-Reports-Fourth-Quarter-and-Full-Year-2017-Results/default.aspx.

19.     Much of Facebook's profit is based on user data, such as that which is the subject of this lawsuit.[8]

20.     Facebook publishes various agreements and policies which set forth some of its duties with respect to the oceans of personal data that it collects from its users, including Plaintiffs and the proposed class.

## V.     FACTUAL ALLEGATIONS

21.     Recent news reports are plentiful and distressing: in 2014, the personal information of some 70 million Americans[9] was collected improperly from Facebook by a foreign company that sold it to yet another foreign company, all with the aim of influencing U.S. elections.[10]  This breach occurred in broad daylight, thanks to the broad, improper access that Facebook had given to application developers on its platform.

22.     As Facebook CEO Mark Zuckerberg admitted in the wake of these revelations:

> [I]t's clear now that we didn't do enough.  We didn't focus enough on preventing abuse and thinking through how people could use these tools to do harm as well.  That goes for fake news, foreign interference in elections, hate speech, in addition to developers and data privacy.  We didn't take a broad enough view of what our responsibility is, and that was a huge mistake.  It was my mistake.[11]

23.     While there is an implication in Mr. Zuckerberg's comments that Facebook was as surprised as anyone by what had occurred, in fact this "huge mistake" was something Facebook should have been laser-focused on preventing.  In 2012, to avoid imminent legal action, Facebook entered into a consent order with the FTC regarding its privacy policies and practices.  The complaint that was

---

[8] *See, e.g.*, Sec. V.B, *infra*.

[9] Initial reports pegged the number at about 50 million.  *See, e.g.*, Matthew Rosenberg *et al.*, *How Trump Consultants Exploited the Facebook Data of Millions*, THE NEW YORK TIMES (Mar. 17, 2018) https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.

[10] *See, e.g.*, Carole Cadwalladr, *'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower*, THE GUARDIAN (Mar. 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump; Rosenberg *et al.*, *supra* n.9.

[11] *Hard Questions: Q&A with Mark Zuckerberg on Protecting People's Information*, FACEBOOK (Apr. 4, 2018), https://newsroom.fb.com/news/2018/04/hard-questions-protecting-peoples-information/.

put on hold specifically referenced app-developer access to Facebook friends' data.[12]  But as these events demonstrate, Facebook failed to take serious heed.

**A.      Facebook's collection of massive amounts of personal information from its users**

24.      The price of entry to Facebook's social network is personal information.[13]  Facebook collects so much information that a few years ago, its U.S. storage facilities were set up to maintain multiple exabytes[14] of data,[15] which included that of its then nearly 200 million U.S. users.[16]

**B.      Facebook's monetization of the data it collects from users**

25.      Facebook is by no means an eleemosynary enterprise, whatever the company rhetoric about enabling connections among its members.

**1.      The making of an advertising giant through greater leveraging of user data**

26.      Facebook's practice of making users' data widely and too-easily available to application developers and websites was not by accident or oversight.  It was a clear and deliberate business strategy designed to increase its revenues and market power.  This plan was wildly successful and created huge incentives for Facebook to ignore or even encourage abuses of users' data.

---

[12] FTC Complaint at 3, 10-11, *In the Matter of Facebook, Inc.*, FTC Dkt. No. C-4365 (July 27, 2012), available at https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120810facebook cmpt.pdf.

[13] *See, e.g.*, Data Use Policy § I ("Information we receive and how it is used"), FACEBOOK (revised Nov. 15, 2013), available at https://web.archive.org/web/20141231072722/https://www.facebook .com/full_data_use_policy (archived Dec. 31, 2014) (data use policy in place in 2014, detailing, *inter alia*, information that is "required when you sign up for the site, as well as the information you choose to share") ("Nov. 15, 2013 Data Use Policy").

[14] "An Exabyte is approximately 1,000 Petabytes.  Another way to look at it is that an Exabyte is approximately one quintillion bytes or one billion Gigabytes.  There is not much to compare an Exabyte to. It has been said that 5 Exabytes would be equal to all of the words ever spoken by mankind."     *Megabytes, Gigabytes, Terabytes… What Are They?*, WHAT'S A BYTE, http://www.whatsabyte.com (last accessed Apr. 8, 2018).

[15] *See, e.g.*, Krish Bandaru *et al.*, *Under the hood: Facebook's cold storage system*, FACEBOOK (May 4, 2015), https://code.facebook.com/posts/1433093613662262/-under-the-hood-facebook-s-cold-storage-system-/.

[16] In 2015, there were approximately 192 million U.S. Facebook users; the number is expected to rise to some 207 million U.S. users this year.

27.     As *The Economist* magazine noted in 2017, "The world's most valuable resource is no longer oil, but data."[17]

28.     While today, targeted digital advertising is increasingly a duopoly between corporate behemoths Google and Facebook, in 2010, Facebook was exceedingly small by comparison, and at a significant disadvantage to Google in terms of collecting data about Internet users.  So Facebook developed a business strategy to change that and dramatically grow its business and revenues.

29.     Facebook had long recognized the need to engage with external developers of applications and websites, in order to encourage the development of more compelling and engaging apps that would increase the amount of time that users spent on the Facebook platform.  In 2010, Facebook took dramatic steps to increase that level of engagement.

30.     At its 2010 developer conference in San Francisco (known as "F8"), Mr. Zuckerberg announced the "Open Graph."[18]

31.     While in 2010, Facebook had 400 million users and a great deal of data about those users from their activities on Facebook, it lacked a way to effectively gather data about those and other people from around other places on the Internet.

32.     Mr. Zuckerberg's keynote at that 2010 conference laid out the strategy to solve this problem:

> We think that what we have to show you today will be the most transformative thing we've ever done for the web.  There are a few key themes that we are going to be talking about today.  The first is the Open Graph that we're all building together.  Today, the web exists mostly as a series of unstructured links between pages, and this has been a powerful model, but it's really just the start.  The Open Graph puts people at the center of the web.  It means the web can become a set of personally and semantically meaningful connections between people and things.  I am FRIENDS with you.  I am ATTENDING this event.  I LIKE this band.  These connections aren't just happening on Facebook, they're happening all over the web, and today, with the Open Graph, we're going to bring all of these together.

---

[17] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/news/leaders/21721656-data-economy-demands-new-approach-antitrust-rules-worlds-most-valuable-resource.

[18] Caroline McCarthy, *Facebook F8: One graph to rule them all*, CNET (Apr. 21, 2010), https://www.cnet.com/news/facebook-f8-one-graph-to-rule-them-all/.   This is the Graph API v1.0 referenced below.  (*See* ¶¶ 61–62, *infra*.)

* * *

> At our first F8, I introduced the concept of the Social Graph. The idea that if you mapped out all of the connections between people and things in the world it would form this massive interconnected graph that just shows how everyone is connected together. Now Facebook is actually only mapping out a part of this graph, mostly the part around people and the relationships that they have. You guys [developers] are mapping out other really important of the graph. For example, I know Yelp is here today. Yelp is mapping out the part of the graph that relates to small businesses. Pandora is mapping out the part of the graph that relates to music. And a lot of news sites are mapping out the part of the graph that relates to current events and news content. If we can take these separate maps of the graph and pull them all together, then we can create a web that is more social, personalized, smarter, and semantically aware. That's what we're going to focus on today.[19]

33.     To execute on this strategy, Facebook introduced the Open Graph API (or "Application Programming Interface"), a way for application and website developers to access information from Facebook about users and their Facebook friends in exchange for sending back to Facebook data that they might gather about those users from their websites and applications. This was valuable for developers, and valuable for Facebook, but undertaken on the backs of their users.

34.     The incentives for Facebook were clear. More developers and websites using the Facebook Platform meant more user engagement with Facebook, and, with the introduction of the Open Graph API, much more data for Facebook to use to enhance and hone its user profiles and to better target advertising. And the immediate impact was dramatic: "We expect that in the first 24 hours alone we're going to serve one billion 'like' buttons on the Web," Mr. Zuckerberg said.

35.     In its zeal to use its users as bait to attract developers, Facebook also made it much easier for those developers to abuse the data it was getting from Facebook.

36.     As Mr. Zuckerberg also announced at the 2010 F8 conference:

> We've had this policy where you can't store or cache data for any longer than 24 hours, and we're going to go ahead and get rid of that policy. So now, if a person comes to your site, and a person gives you permission to access their information, you can store it. No more having to make the same API calls day-after-day. No more needing to build different code paths just to handle information that Facebook users are

---

[19]  Jon Thralow, *Mark Zuckerberg keynote at f8 2010*, YOUTUBE (May 24, 2010), https://www.youtube.com/watch?v=4SOcRKINiSM (transcription).

sharing with you.  We think that this step is going to make building with Facebook Platform a lot simpler.[20]

37.     Developers would now be able to store vast quantities of data they obtained from Facebook.  Not surprisingly, some of those developers found other ways to use and monetize that data themselves.

38.     Unfortunately for its users, Facebook had every incentive to ignore any violations of "terms of service" by developers.  More developers meant more users, more user engagement, and more data for Facebook.  Addressing or policing violations was not in its financial interest as its advertising revenues skyrocketed.  Instead, Facebook made it easier for developers to commit exactly the kinds of abuses and violations that have been revealed.

39.     This strategy was extremely successful.  Facebook has profited handsomely from its practices.  It has gone from a small player in 2010 to a duopolist in online advertising today.  Facebook enabled, ignored, or intentionally did not police the exploitation of user data by developers because it worked to its interest to do so.[21]

**2.     The relentless push for greater profitability from user data**

40.     In 2014, the year in which the subject data was improperly accessed and collected, Facebook's net income was $2.94 billion.[22]

41.     Most of this income is derived from advertising.  In Q4 2014, for example, "[r]evenue from advertising was $3.59 billion, a 53% increase from the same quarter [in 2013]."[23]

42.     Facebook has become such a dominant force in advertising because it knows so much about its users.  As the website Investopedia summarizes:

> Advertisers can use the wealth of personal data about users from Facebook's product ecosystem for ads.  For its part, the Menlo Park, Calif.-based company claims that it makes the data anonymous and serves the information to advertisers in custom demographic buckets.

---

[20] *Id.*

[21] Mathew Ingram, *How Google and Facebook Have Taken Over the Digital Ad Industry*, FORTUNE (Jan. 4, 2017), http://fortune.com/2017/01/04/google-facebook-ad-industry/.

[22] *Facebook Reports Fourth Quarter and Full Year 2014 Results*, FACEBOOK (Jan. 28, 2015), https://investor.fb.com/investor-news/press-release-details/2015/Facebook-Reports-Fourth-Quarter-and-Full-Year-2014-Results/default.aspx.

[23] *Id.*

Advertisers can further slice and dice the buckets based on their branding goals. . . .

For example, advertisers can serve up custom ads to Facebook users from specific income groups or regions. They can also target users based on other categories, such as sexual orientation, religion or political affiliation. Facebook has developed a broad variety of ad products for different stages of the branding lifecycle.

For example, Facebook's Dynamic Ads product enables advertisers to upload their entire product catalog and target customers at specific income levels. Similarly, its Lead Ads offering help advertisers in lead generation. These products have cemented Facebook's position in digital ads.[24]

43. Also, in 2014, Facebook was enthusiastically endeavoring to make even more money off of its users' data.[25] One initiative helped to strengthen its exclusive control over this data,[26] while a second, the Audience Network, enabled it to monetize that data by the sale of targeting to advertisers in places (third-party mobile sites) other than its own website or mobile app.[27]

44. And by this time, Facebook had begun sharing data with outside data brokers, too, in an effort to help them target specific categories of its users by permitting them to mate Facebook user data with information they had gathered elsewhere.[28] Facebook benefited when advertisers bought ads targeted to its users. And while Facebook has announced in the last few days that it will stop sharing data with these outside brokers, some surmise that it is doing so largely because it no longer needs their data to complement its own for purposes of directed advertising.[29]

---

[24] Rakesh Sharma, *How Does Facebook Make Money?*, INVESTOPEDIA (Dec. 11, 2017) https://www.investopedia.com/ask/answers/120114/how-does-facebook-fb-make-money.asp.

[25] *See, e.g.*, Parmy Olson, *Facebook Moves to Become the World's Most Powerful Data Broker*, FORBES (Apr. 30, 2014), https://www.forbes.com/sites/parmyolson/2014/04/30/facebook-moves-to-become-the-worlds-most-powerful-data-broker/#3433cc342006; *see also* Peter Kafka, *Facebook Will Use Facebook Data to Sell Ads on Sites That Aren't Facebook*, RECODE (Sept. 28, 2014), https://www.recode.net/2014/9/28/11631346/facebook-will-facebook-data-to-sell-ads-on-sites-that-arent-facebook.

[26] *See id.*

[27] *Introducing Facebook's Audience Network*, FACEBOOK (Apr. 30, 2014), https://www.facebook.com/business/help/788333711222886.

[28] *See, e.g.*, Ingrid Lundun, *Facebook Launches Partner Categories, 500+ Generic Profiles To Target Ads Better, With Data From Datalogix, Epsilon, Acxiom*, TECHCRUNCH (Apr. 10, 2013), https://techcrunch.com/2013/04/10/facebook-launches-partner-categories-500-profiles-to-target-ads-better-on-mobile-and-desktop-using-data-from-datalogix-epsilon-and-axciom/.

[29] *See, e.g.*, Drew Harwell, *Facebook, longtime friend of data brokers, becomes their stiffest competition*, THE WASHINGTON POST (Mar. 29, 2018), https://www.washingtonpost.com/news/the-

**C.      Facebook's agreements and policies applicable to user data**

45.      In 2014, Facebook maintained contracts and policies that applied to user data.  Among these were its Statement of Rights and Responsibilities and its Data Use Policy.[30]  Facebook also maintained a Platform Policy applicable to developers, which included terms meant for the protection of users.[31]

46.      While each of these documents contemplated the sharing of user data with app developers, each contemplated sharing only under very limited circumstances, and for very limited purposes.  They did *not* contemplate the sort of gathering and transferring engaged in by GSR/Kogan, which Facebook should have prevented.

47.      *First*, per the Statement of Rights and Responsibilities, Facebook promised as follows:

> You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings.
>
> * * *
>
> When you use an application, the application may ask for your permission to access your content and information as well as content and information that others have shared with you.  *We require applications to respect your privacy*, and your agreement with that application will control how the application can use, store, and transfer that content and information.[32]

48.      As to the former provision, however, Facebook failed to provide such a control. Instead, it provided a difficult-to-find setting box advising only that "People on Facebook who can see your info can bring it with them *when they use apps.  This makes their experience better and more social.  Use the settings below to control the categories of information that people can bring with them*

---

switch/wp/2018/03/29/facebook-longtime-friend-of-data-brokers-becomes-their-stiffest-competition/?utm_term=.5c74ccd99ad6.

[30]      *Statement of Rights and Responsibilities*, FACEBOOK (revised Nov. 13, 2015), available at https://web.archive.org/web/20150108090947/https://www.facebook.com/terms.php (archived Jan. 8, 2015) ("Nov. 13, 2015 Statement of Rights and Responsibilities"); Nov. 15, 2013 Data Use Policy, *supra* n.13.

[31]      *See, e.g.*, *Platform Policy*, FACEBOOK (2014), available at https://web.archive.org/web/20140626132443/https://developers.facebook.com/policy (archived June 26, 2014).

[32]      Nov. 13, 2015 Statement of Rights and Responsibilities, *supra* n.30 (emphasis added).  The terms also contain several provisions applicable to developers that plainly are meant to inure to the benefit of users.  They include prohibitions on transferring or selling user data to third-parties such as Cambridge Analytica or SCL, *see id.*, but again, Facebook did not enforce these.

*when they use apps, games and websites*."[33]  This box said nothing about the collection and storage of data, and certainly nothing about its transfer to others beyond the app developer, nor did it allow the prevention of these occurrences, despite Facebook's pledge.

49.    As to the latter provision, Facebook did nothing to *require* Kogan/GSR to respect its app users' privacy, despite its promise. For example, even after detecting that Kogan/GSR was collecting such massive amounts of data for a personality-test app, Facebook did not require the developer to respect users' privacy by ceasing the collection.

50.    *Second*, per the Data Use Policy, Facebook represented and promised as follows:

> Your friend list [in connection with application use] helps the application make your experience more social *because it lets you find your friends on that application*.  Your User ID helps the application personalize your experience because it can connect your account on that application with your Facebook account, and it can access your basic info, which includes your public information and friend list.  This includes the information you choose to make public, as well as information that is always publicly available.  If the application *needs* additional information, such as your stories, photos or likes, it will have to ask you *for specific permission*.

> * * *

> Your friends and the other people you share information with often want to share your information with applications *to make their experiences on those applications more personalized and social*.  For example, one of your friends might want to use a music application that allows them to see what their friends are listening to.  To get the full benefit of that application, your friend would want to give the application her friend list – which includes your User ID – so the application knows which of her friends is also using it.  *Your friend might also want to share the music you "like" on Facebook.*  If you have made that information public, then the application can access it just like anyone else.  *But if you've shared your likes with just your friends, the application could ask your friend for permission to share them.*

> * * *

> If an application asks permission from someone else to access your information, *the application will be allowed to use that information only in connection with the person that gave the permission, and no one else*.[34]

---

[33] *See* Graham Cluley, *How to stop your friends' Facebook apps from accessing *your* private information*, Sophos (Apr. 3, 2013), https://nakedsecurity.sophos.com/2013/04/03/how-to-stop-your-friends-facebook-apps-from-accessing-your-private-information/ (emphasis added).

[34] Nov. 15, 2013 Data Use Policy, *supra* n.13 (emphasis added).

51.     In fact, however, Facebook did not restrict the use of friend lists to situations where they would allow a user to find a friend, nor did it actually restrict app developers from asking for more data than was needed for their apps to work.  Further, it did not actually enforce the promise that app developers could access data "to make the [user's] experiences on those applications more personalized and social."[35]  Nor did it actually restrict the information to uses "in connection with the person that gave the permission, and no one else."[36]

52.     *Third*, as for Facebook's Platform Policy, which is linked from its Terms, it also contained provisions directed to developers that told developers not to transfer or sell data as Kogan/GSR did here.[37]  It also told them only to use the data "in the person's experience in [the developer's] app."  Again, however, Facebook did not enforce these provisions,[38] which were designed for its users' benefit and part of the privacy protections they expected contractually.

**D.      The Kogan/GSR-Cambridge Analytica breach**

53.     On March 17, 2018, *The New York Times* published an article entitled, "How Trump Consultants Exploited the Facebook Data of Millions."[39]  The following day, *The Guardian* published a story entitled, "'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower."[40]  Both articles addressed the data breach that is the subject of this lawsuit.

54.     In 2013, a major paper on the process of quantifying personality was published.  Two Cambridge University psychologists, one of whom was Michael Kosinski, were the experts in this new field.  Dr. Kosinski's co-researcher, David Stillwell, had written Facebook apps years previously, and one called "myPersonality" became very popular.  Mr. Stillwell (not yet a doctor) discovered that 40%

---

[35] *Id.*

[36] *Id.*

[37] *Platform Policy* § 3 (Protect Data), Nos. 1, 9-10, FACEBOOK (2014), available at https://web .archive.org/web/20141230035918/https://developers.facebook.com/policy/ (archived Dec. 30, 2014).

[38] Now after the horses are long gone from the barn, Facebook acknowledges that Dr. Kogan breached the Platform Policy.  Paul Grewal, *Suspending Cambridge Analytica and SCL Group from Facebook*, FACEBOOK (Mar. 16, 2018), https://newsroom.fb.com/news/2018/03/suspending-cam bridge-analytica/.  But so did Facebook vis-a-vis Plaintiffs and the proposed class, by doing nothing to enforce it.

[39] Rosenberg *et al.*, *supra* n.9.

[40] Cadwalladr, *supra* n.10.

of these users had given him access to their Facebook profiles.  "Suddenly, there was a way of measuring personality traits across the population and correlating scores against Facebook 'likes' across millions of people."[41]

55.     That same year, Christopher Wylie, a young, Canadian Ph.D. student, could not shake the political bug.  The previous year he'd worked for the Liberal Democrats in the U.K.  Following publication of the 2013 paper, he, among others, saw the potential in the research.  About this time he was wondering why the Liberal Democrats couldn't seem to win elections.  Impressed with the research paper, he pitched the party with a new way to identify potential new voters based on the proposition that "personality traits could be a precursor to political behaviour." But the party wasn't interested.[42]

56.     Then a party connection introduced Mr. Wylie to a company called SCL Group.  One of its subsidiaries was SCL Elections, which would go on to create Cambridge Analytica.  Cambridge Analytica would go on to be funded by Robert Mercer, the American hard-right billionaire.[43] Alexander Nix, then CEO of SCL Elections, offered Mr. Wylie a job.  Lured by the promise of intellectual freedom and experimentation, Mr. Wylie took the job.  A few months later, still in 2013, Mr. Wylie met Steve Bannon, who was in the U.K. to support Brexiter Nigel Farage.  Someone had turned Mr. Bannon on to the notion that SCL could help conduct "'cyberwarfare for elections.'"[44]

57.     Sometime thereafter, Mr. Bannon and Mr. Wylie flew to New York to meet with Mr. Mercer and his daughter, Rebekah, in Manhattan.  Mr. Mercer listened as Mr. Wylie explained a 2014  paper called "'Computer-based personality judgments are more accurate than those made by humans.'"[45]

58.     Mr. Mercer was interested for political purposes, but they'd need data.   After negotiating with Dr. Kosinski toward using his data, the parties hit an impasse.   Then one of

---

[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*

Dr. Kosinski's colleagues, Dr. Kogan, stated that he could replicate the Kosinski-Stillwell research.[46] Though Mr. Wylie ran with the idea, the notion of replicating the Kosinski work evidently was suggested by an employee of Palantir Technologies, which was co-founded by Peter Thiel, another American billionaire.  (Palantir itself denies any involvement with this matter.)[47]

59.     By June 14, 2014, Dr. Kogan had formed his company, Global Science Research Ltd., and signed an agreement with Cambridge Analytica's affiliate, SCL Elections Limited.[48]  It called for Dr. Kogan to gather millions of Facebook records via a Facebook app he created.[49]  The contract provided in part:

> GS grants to SCL a non-transferable, non-sublicensable, non-assignable, non-exclusive and limited subscription license ("License") to use GS's online data harvesting and psychological profiling technology ("GS Technology") and to access psychological scores created by GS's underlying harvested datasets and algorithms ("GS Profiled Data") to further enhance or augment its political modeling of the population in eleven states within the Territory unless a future superseding agreement can be reached.[50]

60.     As for Dr. Kogan's app, Facebook has suggested (though it does not state) that it was duped into allowing access and collection of the data at issue by an academic whose app seemed to suggest scholastic purposes.[51]  Dr. Kogan denies even the suggestion.  He claims that initially his app was for academic research, but that he re-purposed it for commercial use with Facebook.[52]  Facebook seems to admit as much, though it strays too far afield in stating that "Kogan gained access to this information *in a legitimate way and through the proper channels* that governed all developers on

---

[46] *Id.*

[47] Nicholas Confessore *et al.*, *Spy Contractor's Idea Helped Cambridge Analytica Harvest Facebook Data*, THE NEW YORK TIMES (Mar. 27, 2018), https://www.nytimes.com/2018/03/27/us/cambridge-analytica-palantir.html.

[48] *See* Exhibit A (copy of contract).

[49] *See id.* at 11-12; *see also* Martineau, *supra* n.2 (discussing app).

[50] Exhibit A at 3; *see also id.* at 15-16 (listing Arkansas, Colorado, Florida, Iowa, Louisiana, Nevada, New Hampshire, North Carolina, Oregon, South Carolina, and West Virginia as the 11 states).

[51] Grewal, *supra* n.38 (claiming lies on the part of Kogan).

[52] Martineau, *supra* n.2.

Facebook at that time . . . ."[53]  To Plaintiffs and the proposed class, there was nothing legitimate about it.

61.     In fact, Kogan/GSR consciously exploited another avenue left open by Facebook.  By the time GSR entered into its contract with SCL Elections, under which SCL would pay approximately $800,000 for the data at issue,[54] Facebook had decided to deprecate its then-current Graph API v1.0—the API for its platform—in favor of the new Graph API v2.0, which would shut down the access to extensive Facebook friends' data on the part of its app developers.[55]  But it grandfathered apps such as Dr. Kogan's for a year,[56] which he well knew.[57]

62.     As for what was collectable from Facebook friends by Dr. Kogan's app, the following lists set forth the permissions/profile items available under Graph API v.1.0:

"Extended Profile Properties" Permissions:

- friends_about_me
- friends_actions
- friends_activities
- friends_birthday
- friends_checkins
- friends_education_history
- friends_events

---

[53] Grewal, *supra* n.38 (emphasis added).  Though Facebook seems to suggest angrily in this blog post that it was a victim, too, interestingly, *it actually employs one of the signers of the SCL Elections-GSR contract, Joseph Chancellor, who signed as Co-Director, GSR.  Compare* Exhibit A at 12, *with* Donie O'Sullivan, *Facebook investigating employee's links to Cambridge Analytica*, CNN (Mar. 18, 2018),  http://money.cnn.com/2018/03/18/technology/business/facebook-cambridge-analytica/index.html.

[54] Dr. Kogan claims that he didn't profit from these payments.  Rather, he says, he spent the money on paying $3-4 to survey participants.  He says that rather than money, he wanted to "get a data set that then [he] could do research on."  Kaleigh Rogers, *The Researcher Who Gave Cambridge Analytica Facebook Data on 50 Million Americans Thought It Was 'Totally Normal'*, MOTHERBOARD (Mar. 21, 2018), https://motherboard.vice.com/en_us/article/ywxgeg/cambridge-analytica-researcher-interview.  Of course, the tens of millions of Facebook friends whose data was harvested received none of this money.

[55] Josh Constine *et al.*, *Everything Facebook Launched At F8 And Why*, TECHCRUNCH (May 2, 2014),  https://beta.techcrunch.com/2014/05/02/f8/?_ga=2.191731562.1918755815.1523019427-1613317869.1523019427.

[56] Josh Constine, *Facebook Is Shutting Down Its API For Giving Your Friends' Data To Apps*, TECHCRUCH (Apr. 28, 2018), https://techcrunch.com/2015/04/28/facebook-api-shut-down/.

[57] *See, e.g.*, Exhibit A at 15 ("GS's method [of accessing Facebook data] relies on a pre-existing application functioning under Facebook's old terms of service.  New applications are not able to access friend networks and no other psychometric profiling applications exist under the old Facebook terms.").

- friends_games_activity
- friends_groups
- friends_hometown
- friends_interests
- friends_likes
- friends_location
- friends_notes
- friends_online_presence
- friends_photo_video_tags
- friends_photos
- friends_questions
- friends_relationship_details
- friends_relationships
- friends_religion_politics
- friends_status
- friends_subscriptions
- friends_website
- friends_work_history

"App friends" Profile Items:

- bio
- birthday
- education
- first_name
- last_name
- gender
- interested_in
- languages
- location
- political
- relationship_status
- religion
- quotes
- website
- work

Presently, Plaintiffs are unaware of exactly which of these categories of data Kogan/GSR sought to and did collect, but they expect to learn through discovery.

**E.     Mission accomplished and aftermath**

63.     As all of the key actors acknowledge, retrieval and transfer of tens of millions of Facebook records occurred as planned.[58]  Evidently, GSR used two initial mechanisms, Mechanical Turk and Qualtrics, to start the survey process; then it asked participants to download its Facebook app, after which the retrieval of friend records began.[59]  Thereafter, the data was transmitted to Cambridge Analytica.[60]  Following revelation of these facts, Facebook released a tool to allow users to learn if their "information [might] have been shared with Cambridge Analytica by the app 'This Is Your Digital Life.'"[61]  It also advised that "[a] small number of people who logged into 'This Is Your Digital Life' also shared their own News Feed, timeline, posts and messages which may have included posts and messages from [users].  They may also have shared [users'] hometown."[62]

64.     There's a dispute as to how this data was used.  As *The New York Times* has reported:

> Cambridge executives have offered conflicting accounts about the use of psychographic data on the [2016 Trump] campaign.  Mr. Nix has said that the firm's profiles helped shape Mr. Trump's strategy – statements disputed by other campaign officials – but also that Cambridge did not have enough time to comprehensively model Trump voters.[63]

---

[58] *See, e.g.*, Mike Schroepfer, *An Update on Our Plans to Restrict Data Access on Facebook*, FACEBOOK (Apr. 4, 2018), https://newsroom.fb.com/news/2018/04/restricting-data-access/ ("In total, we believe the Facebook information of up to 87 million people – mostly in the US – may have been improperly shared with Cambridge Analytica.").  The accompanying graphic puts the U.S. number at approximately 70 million as of April 4, 2018.  *Id.*  Cambridge Analytica, however, responded to this update by reiterating that it purportedly "licensed data for no more than 30 million people from GSR, as is clearly stated in our contract with the research company."  *CA responds to announcement that GSR dataset potentially contained 87 million records*, CAMBRIDGE ANALYTICA (Apr. 4, 2018), https://ca-commercial.com/news/ca-responds-announcement-gsr-dataset-potentially-contained-87-million-records.  But regardless of this particular discrepancy, the key figure is Facebook's current estimate.

[59] *See* Cale Guthrie Weissman, *How Amazon Helped Cambridge Analytica Harvest Americans' Facebook Data*, FAST COMPANY (Mar. 27, 2018), https://www.fastcompany.com/40548348/how-amazon-helped-cambridge-analytica-harvest-americans-facebook-data.

[60] CAMBRIDGE ANALYTICA, *supra* n.58.

[61] Tim Collins & Cheyenne MacDonald, *Cambridge Analytica may have accessed your private Facebook MESSAGES: Here's how to see if your details were compromised*, DAILY MAIL (Apr. 11, 2018), http://www.dailymail.co.uk/sciencetech/article-5602619/Cambridge-Analytica-accessed-PRIVATE-Facebook-messages.html.

[62] *Id.*

[63] Rosenberg *et al.*, *supra* n.9.

65.     It's also not known definitively if Cambridge Analytica has retained a copy of all or portions of the user data it received.  Cambridge Analytica says it destroyed the data,[64] but Facebook questions this.[65]

66.     In any event, it's plain that at least some of this data has not been destroyed,[66] such that it's potentially available to malefactors.  The damage is done.  And certainly it was preventable, had Facebook only lived up to its agreements, policies, and duties as to user data.[67]

## VI.     CLASS ALLEGATIONS

67.     Plaintiffs bring this action pursuant to the provisions of Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of themselves and the following proposed class:

> All U.S. Facebook users whose Facebook data: (a) was accessed and collected by Aleksandr Kogan and his company GSR by way of, or in connection with, a Facebook app called "thisisyourdigitallife" (or "thisismydigitallife"); and (b) transmitted to a third-party, including but not limited to SCL Elections Limited or Cambridge Analytica, whether in exchange for payment to Kogan or GSR, or otherwise.

68.     Excluded from the proposed class are Facebook, its employees, officers, directors, legal representatives, heirs, successors, subsidiaries and affiliates, and the judicial officers and their immediate family members and associated court staff assigned to this case, as well as all persons who make a timely election to be excluded from the proposed class.

69.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

---

[64] *Message from acting CEO Dr. Alexander Tayler*, CAMBRIDGE ANALYTICA (Mar. 23, 2018), https://ca-commercial.com/news/message-acting-ceo-dr-alexander-tayler.

[65] Grewal, *supra* n.38.

[66] *See, e.g.*, *Revealed: Cambridge Analytica data on thousands of Facebook users still not deleted*, CHANNEL 4 NEWS (Mar. 28, 2018), https://www.channel4.com/news/revealed-cambridge-analytica-data-on-thousands-of-facebook-users-still-not-deleted.

[67] *See* Paul Lewis, *'Utterly horrifying': ex-Facebook insider says cover data harvesting was routine*, THE GUARDIAN (Mar. 20, 2018), https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandy-parakilas.   As the article recounts, Sandy Parakilas, "the platform operations manager at Facebook responsible for policing data breaches by third-party software developers between 2011 and 2012, . . . said Facebook had terms of service and settings that 'people didn't read or understand,' and the company did not use its enforcement mechanisms, including audits of external developers, to ensure data was not being misused." *Id.*

70.     This action meets all applicable standards of Fed. R. Civ. P. 23 for class certification. More specifically, Plaintiffs can demonstrate:

71.     <u>Numerosity</u>.  The members of the proposed class are so numerous and geographically dispersed that individual joinder of all proposed class members is impracticable.  *See* Fed. R. Civ. P. 23(a)(1).  While Plaintiffs believe that that there are millions of members of the proposed class, based on Facebook's admission that the data of some 70 million U.S. Facebook users was collected and transmitted to Cambridge Analytica,[68] the precise number of class members is unknown, but may be ascertained from Facebook's books and records.  Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include email, Facebook message services, U.S. mail, Internet postings, and/or published notice.

72.     <u>Commonality and Predominance</u>.  This action involves common questions of law and fact, which predominate over any questions affecting individual class members.  *See* Fed. R. Civ. P. 23(a)(2) and (b)(3).  These include, without limitation:

    a.     Whether Facebook engaged in the conduct alleged in this complaint;

    b.     Whether Facebook promulgated agreements and policies that it understood to apply to Facebook users such as Plaintiffs and other Facebook users known as Facebook friends;

    c.     Whether Facebook promulgated agreements and policies that bound it for various purposes, including with respect to its duties to its users regarding the data it regularly collects from them and stores;

    d.     Whether Facebook had in place systems, practices, and internal policies meant to give effect to and enforce its data-privacy agreements and policies;

    e.     Whether Facebook adhered to its agreements, policies, and best practices with regard to the user data that is the subject of this lawsuit;

    f.     Whether Facebook knew of Kogan/GSR's access to, collection of, and transmittal to third parties of, the user data that is the subject of this lawsuit;

---

[68] Schroepfer, *supra* n.58.

g.   Whether Facebook made any effort to halt access to, collection of, and transmittal to third parties of, the user data that is the subject of this lawsuit;

h.   Whether Facebook spends adequately to give effect to and enforce its agreements and policies regarding access to, collection of, and transmittal to third parties of, the user data that is the subject of this lawsuit;

i.   Whether Facebook knew about deficiencies in its agreements or policies governing user data, and, if so, for how long;

j.   Whether Facebook knew about deficiencies in the enforcement of its agreements and policies regarding access to, collection of, and transmittal to third parties of, the user data that is the subject of this lawsuit;

k.   Whether Facebook's conduct, including but not limited to its alleged deceptive conduct, violates consumer protection statutes or other laws as asserted herein;

l.   Whether Facebook's conduct violates the Stored Communications Act as alleged herein;

m.   Whether Plaintiffs and members of the proposed class are entitled to damages, including statutory and punitive damages, due to Facebook's conduct as alleged in this complaint, and if so, in what amounts; and

n.   Whether Plaintiffs and other putative class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this complaint.

73.   _Typicality._ Plaintiffs' claims are typical of the putative class members' claims because, among other things, all such class members were comparably injured through Facebook's wrongful conduct as described above. _See_ Fed. R. Civ. P. 23(a)(3).

74.   _Adequacy._ Plaintiffs are adequate proposed class representatives because their interests do not conflict with the interests of the other members of the proposed class they seek to represent; because Plaintiffs have retained counsel competent and experienced in complex class action litigation; and because Plaintiffs intend to prosecute this action vigorously.  The interests of the proposed class will be fairly and adequately protected by Plaintiffs and counsel. _See_ Fed. R. Civ. P. 23(a)(4).

75.     <u>Declaratory and Injunctive Relief</u>.  Facebook has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the proposed class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the proposed class as a whole.  *See* Fed. R. Civ. P. 23(b)(2).

76.     <u>Superiority</u>.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Facebook, so it would be impracticable for members of the proposed class to individually seek redress for Facebook's wrongful conduct.  Moreover, even if class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  *See* Fed. R. Civ. P. 23(b)(3).

## VII.    APPLICATION OF CALIFORNIA LAW

77.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

78.     Facebook's terms and conditions in and about 2014, and currently, provide for the application of California law to disputes such as this.[69]

---

[69] Nov. 13, 2015 Statement of Rights and Responsibilities ¶ 16.1 (Disputes), *supra* n.30 ("The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions."); Jan. 30, 2015 Statement of Rights and Responsibilities ¶ 15.1 (Disputes), *supra* n.4 ("The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions.").

79.     Additionally, as alleged herein, and on information and belief, all pertinent decisions and activities took place in, and emanated from, Facebook's California headquarters,[70] further justifying the application of California law.

80.     Accordingly, California law applies to Plaintiffs' claims and those of members of the proposed nationwide class.

## VIII.   EQUITABLE TOLLING/CONTINUING VIOLATION

81.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

82.     By its own admission, Facebook does not consider the Kogan-GSR-Cambridge Analytica incident to be a data breach;[71] therefore, Facebook did not notify Plaintiffs, or, upon information and belief, other putative class members, of Kogan/GSR's unauthorized and impermissible gathering and transfer of their data in or around 2014.  Until news broke so widely based upon Mr. Wylie's whistleblowing in March 2018, Plaintiffs had no reason to suspect that Facebook was not adhering to or enforcing its agreements and policies with respect to the data it collected from them and stored.   Nor did putative class members have any reasonable suspicion, let alone confirmation, either.

83.     Further, based on recent reports, at least some of the putative class's data is still available for exploitation on the web,[72] which points to continuing violations of Facebook's agreements and policies.

---

[70] To the best of Plaintiffs' knowledge, Facebook's privacy officials are based in its California headquarters, so pertinent agreements, policies, and practices would have emanated from there as well. *See, e.g.*, Nov. 13, 2012 Facebook letter to FTC, available at https://www.ftc.gov/system/files/documents/foia_requests/1302facebookcompliance.pdf at p. 2 (cover letter that accompanied Facebook's first compliance report under the FTC consent order issued in *In the Matter of Facebook, Inc.*, FTC Dkt. No. C-4365, which letter and report were signed by Facebook's Associate General Counsel-Privacy and its Product Counsel; their letterhead gave their business address as 1601 Willow Road, Menlo Park, California).

[71] Grewal, *supra*  n.38 ("The claim that this is a data breach is completely false.").

[72] *See, e.g.*, Kevin Granville, *Facebook and Cambridge Analytica: What You Need to Know as Fallout Widens*, THE NEW YORK TIMES (Mar. 19, 2018), https://www.nytimes.com/2018/03/19/technology/facebook-cambridge-analytica-explained.html ("But the data, or at least copies, may still exist. The Times was recently able to view a set of raw data from the profiles Cambridge Analytica obtained.").

84.     Accordingly, all applicable statutes of limitation, if any, are tolled or otherwise inapplicable, such that all claims of Plaintiffs and putative class are timely.

## IX.     CAUSES OF ACTION

### COUNT I

### BREACH OF CONTRACT

85.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

86.     Plaintiffs and members of the proposed class had agreements with Facebook.  These agreements, including Facebook's Data Use Policy[73] and its Statement of Rights and Responsibilities,[74] involved a mutual exchange of consideration whereby Plaintiffs and members of the class exchanged personal data for access to Facebook's social network, but only under the condition that this personal information be protected per the terms of Facebook's agreements and policies.  By way of these agreements and policies, Facebook promised only to share user data pursuant to governing agreements and applicable policies.

87.     Plaintiffs used the Facebook social network responsibly, taking care not to violate Facebook's terms and policies.

88.     The failure of Facebook to keep its promises to Plaintiffs and the proposed class and to keep its users' demonstrably valuable data safe and secure from unauthorized and impermissible access and transfer constitutes a material breach of the agreements between Facebook on the one hand and Plaintiffs and the proposed class on the other.

89.     As a result of the aforesaid breaches of Facebook's agreements with Plaintiffs and members of the proposed class, those Facebook users have been harmed and have suffered damages, both by way of dissemination of their personal information and by losing the sales value of that information, in amounts to be proven at trial.  Also, at a minimum, Plaintiffs have suffered nominal damages, which are recoverable per CAL. CIV. CODE § 3360.

---

[73] Nov. 15, 2013 Data Use Policy, *supra* n.13.
[74] Nov. 13, 2015 Statement of Rights and Responsibilities, *supra* n.30.

## COUNT II

### BREACH OF THE IMPLIED COVENENT OF
### GOOD FAITH AND FAIR DEALING

90.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

91.     Plaintiffs and members of the proposed class were required by Facebook to provide data in order to use its social network.  They shared certain other data conditionally—*i.e.*, only pursuant to, and in light of, the protections promised by Facebook's contractual terms and policies governing the provision, access to, storage, and transfer of such data.

92.     Plaintiffs used the Facebook social network responsibly, taking care not to violate Facebook's terms and policies.

93.     Implicit in the agreements between Facebook and Plaintiffs and members of the proposed class was the obligation that Facebook would maintain the putative class's demonstrably valuable information confidentially and securely, per its applicable agreements and policies.[75]  Per these agreements and policies, its users had the right to expect that Facebook would gather, retain, allow access to, and transfer this data only for certain, enumerated purposes.

94.     "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981).

95.     Such a duty is read into contracts and functions as a supplement to the express contractual covenants, in order to prevent a transgressing party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefit of the contract.[76]  Thus, any claim on the part of Facebook that technically it was permitted to allow the collection and transmittal of Plaintiffs' and the putative class's data, must be read in the context of, and give way to, those users' rights to the benefit of the contract, including the terms strictly delimiting such activity.

---

[75] *See, e.g.*, *supra* nn.30-31.

[76] *See, e.g.*, *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (citations omitted).

96.     The duty to perform contractual obligations in good faith applies to Facebook's agreements governing data collection, use, and protection, including its Data Use Policy[77] and Statement of Rights and Responsibilities.[78]  In order not to frustrate the reasonable expectations of Plaintiffs and the putative class under these terms and the contract generally, Facebook was bound not to allow the access, collection, and transfer of enormous sums of data by Kogan/GSR.  But by failing to act reasonably in securing the data of Plaintiffs and the proposed class as alleged herein, Facebook breached the covenant of good faith and fair dealing.

97.     As a result of the aforesaid breaches of the implied covenant of good faith and fair dealing, Plaintiffs and the proposed class have been harmed and have suffered damages, both by way of dissemination of their personal information and by losing the sales value of that information, in amounts to be proven at trial.  Also, at a minimum, Plaintiffs have suffered nominal damages, which are recoverable per CAL. CIV. CODE § 3360.[79]

**COUNT III**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)**

98.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

99.     Plaintiffs bring this count on behalf of themselves and the proposed class.

100.    California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

101.    Plaintiffs and the proposed class suffered economic injury by way of losing the benefit of their bargains with Facebook.  They shared their valuable personal information with Facebook under only under certain terms and conditions, including the promise that Facebook would only share this information under certain conditions.  In other words, they shared their data in exchange for access to

---

[77] *See, e.g.*, n.30.

[78] *See, e.g.*, n.31.

[79] *See, e.g.*, *Thrifty Payless*, 218 Cal. App. 4th at 1244 ("A breach of the implied covenant of good faith is a breach of the contract . . . .") (citation omitted).

the Facebook social network *as well as* the promised privacy protections.  Yet Facebook denied them the benefit of their bargain by failing to deliver on these promised privacy protections and instead sharing their data with valuable app developers such as GSR, which manifestly had no proper reason for accessing and collecting all the data at issue in connection with its "thisisyourdigitallife" app.

102.   By way of expert testimony, Plaintiffs will present evidence at trial of the value of the property that they and other putative class members lost thereby—*i.e.*, their interest in keeping control over their private information as well as the value of their private information itself, the latter of which is illustrated in part by the money that Kogan/GSR and SCL Elections paid for it.

103.   As alleged herein,[80] Facebook's choices, policies, conduct, and actions were undertaken or performed in, and therefore emanated from, California.

**A.   Unfair prong**

104.   Facebook's conduct violates the unfair prong of the UCL in at least the following ways:

    a.   By breaching consumer contracts systematically, as alleged herein;

    b.   By promulgating agreements and policies pertaining to user data, in order to induce the sharing with it of such data, that it evidently never meant to enforce, and that it did not enforce;

    c.   By making it easy for app developers to gather far more user data than they needed for their apps, and by making no real effort to protect this data from transfer to third parties, with no justification; and

    d.   By choosing an unfair, and therefore unlawful, course of action when other, lawful courses were available.  For example, as alleged herein, it detected Kogan/GSR's downloading of massive amounts of user data, but it did nothing to stop it.

105.   Facebook also behaved as alleged in order to gain unfair commercial advantage, even if it meant disregarding the rights and expectations of its users.  Facebook's actions reveal that it wanted to deal with the Kogan-GSR-Cambridge Analytica imbroglio as quietly as possible, so as not

---

[80] *See, e.g.*, *supra* ¶¶ 70.

to imperil the size of its user base or its reputation.  It not only withheld critical information from Plaintiffs and the putative class, but also from its competitors and the marketplace at large, all to its unfair competitive advantage.

106.    Facebook's behavior as alleged herein, which emanated from its headquarters in California, caused harm to Plaintiffs and the putative class as alleged in this complaint.  Had Plaintiffs and putative class members known that Facebook would engage in this unfair behavior, they would not have shared their personal data with it, or they would have demanded payment for it.

107.    Accordingly, Plaintiffs and putative class members have suffered injury in fact, including lost money or property, as a result of Facebook's unfair behavior.

108.    Plaintiffs and the putative class seek to enjoin further unfair acts or practices by Facebook under CAL. BUS. & PROF. CODE § 17200.

**B.      Fraudulent prong**

109.    Additionally, as illustrated by the events described herein, Facebook procured the data of Plaintiffs and members of the proposed class by way of false and fraudulent statements and omissions as to its protection of such data, including via statements and promises in its terms and policies, as referenced herein.[81]  Though Facebook had the means to protect its users' data and to give effect to its agreements and policies with regard to it, it did not employ these means, and certainly not effectively.  Facebook knew of this when it collected and stored this data; nonetheless, it gave false impressions of pertinent facts and its intentions to Plaintiffs and members of the proposed class.

110.    Accordingly, Plaintiffs and putative class members have suffered injury in fact, including lost money or property, as a result of Facebook's fraudulent behavior.

111.    Plaintiffs and the putative class also seek to enjoin further fraudulent acts or practices by Facebook under CAL. BUS. & PROF. CODE § 17200.

---

[81] *See* Sec. V.C, *supra*.

**C.      Unlawful prong**

112.      As alleged in this complaint, Facebook published and promulgated privacy terms and policies[82] at all relevant times on which Plaintiffs and members of the putative class conditioned the collection, storage, and sharing of their data.  Facebook, however, has violated these policies either: (a) knowingly and willfully; or (b) negligently and materially; or (c) both.  Accordingly, Facebook has violated CAL. BUS. & PROF. CODE § 22576, which prohibits an operator of a commercial web site or online service from failing to comply with its own privacy policies.

113.      Also, by way of the systematic and widespread breaches of contract as alleged herein, including those pertaining directly to Plaintiffs and members of the putative class, Facebook has violated the unlawful prong of the UCL.

114.      Accordingly, Plaintiffs and putative class members have suffered injury in fact, including lost money or property, as a result of Facebook's fraudulent behavior.

115.      Plaintiffs and the putative class seek to enjoin further fraudulent acts or practices by Facebook under CAL. BUS. & PROF. CODE § 17200.

**D.      UCL summary**

116.      In sum, with respect to Facebook's violations of the UCL under all three of its prongs, Plaintiffs and the putative class ask that this Court enter such orders or judgments as may be necessary to enjoin Facebook from continuing its unfair and fraudulent practices as described herein, and to award and restore to Plaintiffs and members of the putative class the value of all property, or money, they lost by way of Facebook's unfair, fraudulent, or unlawful competition and activities, including by way of restitution and/or restitutionary disgorgement as provided by CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345 (regarding claims brought for the benefit of senior citizens or disabled persons[83]), among all other appropriate relief.

---

[82] *See, e.g.*, *supra* nn.30-31.

[83] Given the millions of Facebook users affected, it is reasonable to believe, and therefore it is alleged, that some members of the putative class were and are senior citizens or disabled persons.

# COUNT IV

## QUANTUM MERUIT TO RECOVER SUMS
## HAD BY UNJUST ENRICHMENT

117.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

118.    Because no adequate legal remedy is available under any applicable contract, Plaintiffs bring this count in quasi contract on behalf of themselves and their fellow putative class members in order to pursue restitution based on Facebook's unjust enrichment, including by way of Facebook's retention of profits that should have been expended to protect the data of Plaintiffs and the putative class, per its published privacy agreements and policies.[84]

119.    As alleged herein, Facebook has unjustly received and retained monetary benefits from Plaintiffs and the proposed class—*i.e.*, by way of its use of, and profiting from, their data under unjust circumstances, such that inequity has resulted.

120.    By engaging in the conduct described in this complaint, Facebook knowingly obtained benefits from Plaintiffs and the proposed class as alleged herein under circumstances such that it would be inequitable and unjust for Facebook to retain them.

121.    More specifically, by engaging in the acts and failures to act described in this complaint, Facebook has been knowingly enriched by the savings in costs that should have been reasonably expended to protect the data of Plaintiffs and the proposed class.  Facebook was on notice that gathering and transmittal of user data could happen, including by way of previous occurrences and claims brought against it by the FTC, yet it failed to take reasonable steps to pay for the level of security required to have prevented such unauthorized access, gathering, and transmittal to third parties.

---

[84] *See, e.g.*, RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 39(1) (2011) (supporting claims under the opportunistic breach theory of restitution, which provides a claim for relief when a deliberate breach of contract results in profit to the defaulting promisor and the available damage remedy affords inadequate protection to the promisee's contractual entitlement, measured by the profit realized by the defaulting promisor).

122.    Also, Facebook has been enriched unjustly by the use of Plaintiffs and the proposed class's data for its advertising business, and has profited greatly as a result, even though it did not protect this data as it had promised.

123.    By engaging in the conduct described in this complaint, Facebook has knowingly obtained benefits from or by way of Plaintiffs and the proposed class, including by way of the use of their personal information in the course of its business, including its lucrative advertising business, under circumstances such that it would be inequitable and unjust for it to retain them.

124.    Thus, Facebook will be unjustly enriched if it is permitted to retain the benefits derived from the unauthorized and impermissible gathering and sharing of Plaintiffs and the proposed class's data.

125.    Plaintiffs and each member of the proposed class are therefore entitled to a restitutionary award in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by Facebook by means of the above-described actions, or both as the circumstances may merit to provide complete relief to Plaintiffs and the proposed class, whether the sums of monies are those: (a) that it should have devoted to complying with its agreements and policies as they pertain to the user data that is the subject of this lawsuit; or (b) the money it has collected from advertisers and others that corresponds to the user data that is the subject of this lawsuit; or (c) other sums as it may be just and equitable to return to them.

## COUNT V

### VIOLATION OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. § 2701, *ET SEQ.*

126.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

127.    Plaintiffs on their own behalf, and on behalf of members of the proposed class, allege that Facebook has violated the Stored Communications Act, *see* 18 U.S.C. § 2702, including by way of divulging without authorization their communications while in electronic storage.

128.    The Stored Communications Act (SCA) prohibits a person from intentionally accessing without (or in excess of) authorization a facility through which an electronic communications service

is provided and thereby obtaining an electronic communication while it is in "electronic storage." 18 U.S.C. §§ 2701(a) and 2702(a).

129.     Section 2701(a)(1) of the SCA authorizes a private right of action against any person who "intentionally accesses without authorization a facility through which an electronic communication service is provided . . . and thereby obtains . . . access to wire or electronic communication while it is in electronic storage in such system . . . ."

130.     Section 2701(a)(2) of the SCA authorizes a private right of action against any person who "intentionally exceeds an authorization to access [a facility through which an electronic communication service is provided] . . . and thereby obtains . . . access to wire or electronic communication while it is in electronic storage in such system . . . ."

131.     Section 2702(a) of the SCA provides:

> (1)     a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service; and
>
> (2)     a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service;
>
> > (A)     on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service;
> >
> > (B)     solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

132.     Section 2707(b) of the SCA provides that Plaintiffs and class members are entitled to:

> (1)     such preliminary and other equitable or declaratory relief as may be appropriate;
>
> (2)     damages under subsection (c); and
>
> (3)     a reasonable attorneys' fee and other litigation costs reasonably incurred.

133.    Section 2707(c) of the SCA provides that:

> . . . a court may assess damages suffered by the Plaintiffs and any profits made by the violators as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000. If the violation is willful or intentional, the court may assess punitive damages. In the case of a successful action to enforce liability under this section, the court may assess the costs of the action, together with reasonable attorney fees determined by the court.

134.    The SCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).  When Facebook users such as Plaintiffs or other putative class members post messages to Facebook pages or walls, or other Facebook facilities, those messages then are stored on Facebook servers and are thereby given backup protection by Facebook.  Facebook, pursuant to the allegations herein, is an electronic communication service, a remote communication service (or a remote computing service), or both.

135.    Facebook is considered a "person" within the meaning of the SCA. 18 U.S.C. § 2510(6); it is also an entity within the meaning of the SCA.

136.    Facebook provides "electronic communication service[s]" within the meaning of the SCA. 18 U.S.C. § 2510(15).

137.    Plaintiffs' and proposed class members' use of Facebook to convey and store personal information and transmission of that personal information to and from Plaintiffs' Facebook account is considered "electronic communications" within the meaning of the Act. 18 U.S.C. § 2510(12).

138.    The servers that Facebook uses to provide its electronic communications services to Plaintiffs and proposed class members are a "facility" within the meaning of the SCA.

139.    Defendant intentionally accessed without authorization or, alternatively, intentionally exceeded authorization to access, Plaintiffs' and proposed class members' stored electronic communications, which contained highly sensitive personal information, including for purposes of divulging the same to others, either without authorization or in manners that exceeded authorization.

140.    Facebook knowingly divulged Plaintiffs' and proposed class members' stored electronic communications to SCL Elections Limited and Cambridge Analytica, which contained highly sensitive personal information.

141.    As a result of the Defendant's violations of the SCA, Plaintiffs and proposed class members have suffered injury, which includes, but is not limited to, Facebook permitting others as alleged herein to intentionally access Plaintiffs' and proposed class members' stored electronic communications without (or in excess of) authorization and by Facebook's divulging to SCL Elections and Cambridge Analytica the contents of Plaintiffs' and proposed class members' stored electronic communications, which contained sensitive personal information.

142.    Accordingly, Plaintiffs and class members are entitled to statutory damages, actual damages, reasonable attorney's fees and litigation costs, as well as declaratory and injunctive relief.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and that of the proposed class, and against Defendant, as follows:

A.    Certification of the proposed nationwide class as requested, including appointment of Plaintiffs' counsel as class counsel;

B.    Damages and equitable remedies, including statutory damages, punitive damages, restitution, penalties, and disgorgement, together with all other damages or equitable redress available pursuant to or related to the allegations herein, in amounts to be determined at trial;

C.    An order requiring Facebook to pay both pre- and post-judgment interest on any amounts awarded;

D.    An award of costs, expenses, and attorneys' fees;

E.    Orders temporarily and then permanently enjoining Facebook from continuing the unfair and deceptive business practices alleged in this complaint; and

F.    Such other or further relief as may be appropriate.

## XI.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

1    DATED: September 21, 2018                    Respectfully submitted,

2                                                 By: */s/ Shana E. Scarlett*
                                                       Shana E. Scarlett (SBN 217895)
3                                                 HAGENS BERMAN SOBOL SHAPIRO LLP
                                                  715 Hearst Avenue, Suite 202
4                                                 Berkeley, CA 94710
                                                  Telephone: (510) 725-3000
5                                                 Facsimile: (510) 725-3001
                                                  shanas@hbsslaw.com
6
                                                  *Attorneys for Plaintiffs and the Proposed Class*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28